UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ALEC JULIAN JOHNSON,

                        Petitioner,

v.

PAT WARREN,

                        Respondent.

_____/

Case No. 1:18-cv-741

Honorable Paul L. Maloney

## **REPORT AND RECOMMENDATION**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Alec Julian Johnson is incarcerated with the Michigan Department of Corrections at the Macomb Correctional Facility (MRF) in Macomb County, Michigan. Petitioner pleaded guilty in the Van Buren County Circuit Court to one count of first-degree criminal sexual conduct for penile/oral penetration of his girlfriend's four-year-old daughter. On June 6, 2016, the court sentenced Petitioner to a prison term of eighteen to forty years.

On July 3, 2018, Petitioner timely filed his habeas corpus petition. Petitioner does not challenge the voluntary and knowing nature of his plea, nor does he challenge his sentence. Instead, he challenges the trial court's denial of his pretrial motion to suppress his confession. Petitioner's plea was conditional on his continuing right to challenge that denial. His challenges were denied in the Michigan Court of

Appeals and the Michigan Supreme Court.  He raises the same claims now in this Court:

    I.      Did the Trial Court err when it found that the Defendant was not in custodial interrogation and not subject to *Miranda* warnings?

    II.     Did the Trial Court err when it found that Defendant's post-*Miranda* statements were admissible?

    III.    Did the Trial Court err when it found that Defendant's statements were voluntary regardless of a finding of custodial interrogation.

(Pet., ECF No. 1, PageID.2-3.)  Respondent has filed an answer to the petition (ECF No. 7) stating that the grounds should be denied because they lack merit.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds are meritless.  Accordingly, I recommend that the petition be denied.

## Discussion

### I.    Factual allegations

On August 16, 2015, Michigan State Trooper Lena Wileczek and a social worker visited the home where Petitioner lived with his father and step-mother to investigate assault and sexual assault allegations raised against Petitioner by the four-year-old daughter of Petitioner's girlfriend.[1]  Trooper Wileczek invited Michigan State Trooper Thomas Coles to come to the home to provide additional support. Trooper Coles was accompanied by a trooper in training Jeremy Martin.

---

[1] The factual allegations are derived from the transcripts of the motion to suppress hearings on December 18 and 22, 2015 (ECF Nos. 8-4, 8-5), the transcript of the trial court's ruling on the motion on January 15, 2016 (ECF No. 8-6), and the Court's review of the video recordings of the interviews (ECF No. 11).

Once the troopers arrived at the home, they brought Petitioner outside to separate him from the other members of the household.  As Petitioner waited outside, he conversed with Trooper Coles.  Eventually, Trooper Wileczek asked Trooper Coles to see if he could get Petitioner to participate in a voluntary interview at the state police post.

According to Coles, he asked Petitioner if he would participate in such an interview.  According to Petitioner, Coles demanded that Petitioner participate in such an interview.  Petitioner was patted down and then sat down in the front seat of the police vehicle.  Trooper Coles then drove Petitioner to the police post.  The recording system in the vehicle captured video and audio inside the vehicle for the duration of the trip.

When Petitioner arrived at the post, he was placed in an interview room.  The recording system in the interview room captured video and audio of the interview. The door was left open while Petitioner awaited the arrival of his interviewer, Detective Sergeant Shane Criger.  Criger informed Petitioner that he was not under arrest and closed the door, explaining to Petitioner that he was closing the door for privacy.  Detective Criger proceeded to interview Petitioner.  About an hour into the interview, Petitioner confessed to at least three instances of penile/oral penetration of the child.  Shortly thereafter, Criger placed Petitioner under arrest and read Petitioner his *Miranda* rights.  The interview continued and Petitioner continued to confess.

Petitioner, through his counsel, moved to suppress the recorded interview. The trial court heard testimony from the Troopers Wileczek, Coles, and Martin, Detective Sergeant Criger, Petitioner's father, Lynn Johnson, and Petitioner. The court also reviewed the video recordings from the vehicle and the interview room.

When the court ruled on Petitioner's motion to suppress, it reviewed the facts and circumstances surrounding the questioning and Petitioner's confession and concluded that Petitioner was not in custody. A key element of the court's conclusion was the court's determination that Petitioner simply was not credible in his description of the events. The court concluded a reasonable person would not have believed he was in custody during the questioning.

There was a gap of about four minutes between the moment Petitioner first confessed and Detective Criger's reading of Petitioner's *Miranda* rights. The court concluded that Petitioner was not in custody then either. Petitioner also challenged the voluntariness of his confession. The court concluded the confession was voluntary as well.

Petitioner entered his conditional plea a few weeks after the court's ruling. (Plea Tr., ECF No. 8-7.) Because the victim was a young child, the original charge, Mich. Comp. Laws § 750.520b(1)(a) would have carried a 25-year minimum sentence. Mich. Comp. Laws § 750.520b(2)(b). A significant benefit of the plea bargain was a negotiated minimum sentence of eighteen years.

After entering his plea, Petitioner attempted an interlocutory appeal of the court's denial of the motion to suppress.  The Michigan Court of Appeals denied leave.  (Mich. Ct. Ap. Order, ECF No. 8-9, PageID.450.)  Petitioner did not seek leave to pursue the matter further in the Michigan Supreme Court.  (Aff., ECF No. 8-12.)

The trial court sentenced Petitioner as described above on June 6, 2016.[2]  (Sentencing Tr., ECF No. 8-8.)  Petitioner again sought leave to appeal in the Michigan Court of Appeals raising the same challenges to the trial court's ruling on his motion to suppress.  The Michigan Court of Appeals denied leave by order entered September 21, 2016, "for lack of merit in the grounds presented."  (Mich. Ct. App. Order, ECF No. 8-11, PageID.515.)  Petitioner sought leave to appeal that decision in the Michigan Supreme Court.  The supreme court denied leave by order entered April 4, 2017, because the court was "not persuaded that the questions presented should be reviewed . . . ."  (Mich. Order, ECF No. 8-10, PageID.484.)  This timely petition followed.

## II.    AEDPA standard

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA).  The AEDPA "prevents federal

---

[2] Petitioner was also sentenced to 295 days' incarceration—with credit for 295 days' served—on one count of third-degree child abuse.  (Van Buren Cty. Cir. Ct. Register of Actions, ECF No. 8-1, PageID.70-71.)  His guilty plea to that offense was not conditional.  (Plea Tr., ECF No. 8-7, PageID.424-425.)  Accordingly, even if Petitioner were successful in this Court, it would not call into question his guilty plea to third-degree child abuse.  Moreover, because Petitioner was not in custody for that offense at the time he filed his petition, his conviction and sentence for that offense are not before the Court.

habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Williams*, 529 U.S. at 381-82; *Miller v. Straub*, 299 F.3d 570, 578-79 (6th Cir. 2002).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34, 37-38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication

6

on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.

*See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

### III.   Suppression

All three of Petitioner's grounds for relief involve the admissibility of his confession.  The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that, in order to protect an individual's Fifth Amendment privilege against self-incrimination, when an individual is in custody, law enforcement officials must warn the suspect before his interrogation begins of his right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel.  *Id.* at 478-79; *see also Dickerson v. United States*, 530 U.S. 428, 435 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994).  Even so, "the ready ability to obtain uncoerced confessions is not an evil but an unmitigated good . . . . Admissions of guilt resulting from valid *Miranda* waivers are more than merely desirable; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Texas v. Cobb*, 121 S. Ct. 1335, 1342 (2001) (quotation and citation omitted). The cases in which a defendant can make a colorable argument that a confession was compelled despite the fact that law enforcement authorities adhered to *Miranda* are rare.  *Dickerson v. United States*, 530 U.S. 428, 444 (2000) (citation omitted).

Here, Petitioner's confession was elicited in part before the *Miranda* warning and in part after. Petitioner claims that his confession elicited before the *Miranda* warnings should be suppressed because the warnings were required, but not given (habeas ground I). Petitioner claims that part of his confession elicited after the *Miranda* warnings should be suppressed as well because it followed a "mid-stream" *Miranda* warning in violation of *Missouri v. Siebert*, 542 U.S. 600 (2004) (habeas ground II). Finally, Petitioner claims, separate and apart from the *Miranda* warnings, his confession was coerced by the police (habeas ground III).

### A.    In custody

In his first habeas ground, Petitioner contends that he did not understand that he could refuse to go to the police station for an interview and that he reasonably believed that he was in custody at the time of the interview. The trial court disagreed.

*Miranda* warnings are not required unless an individual is "in custody." *Miranda*, 384 U.S. at 444 ("[T]he prosecutor may not use statements . . . stemming from **custodial** interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.") (emphasis added). The test for determining whether an individual is "in custody" for purposes of *Miranda* is objective: whether a reasonable person in the defendant's position, knowing the facts as the defendant knew them, would have felt that he was under arrest or was "otherwise deprived of his freedom in any significant way." *Id.* at 477. The determination does not turn on the subjective views of either the interrogating officer or the person being questioned. *Stansbury*, 511 U.S. at 323; *Mason v. Mitchell*, 320 F.3d 604, 631 (6th Cir. 2003).

The Sixth Circuit has identified several factors to be considered when determining whether an interrogation was custodial:  (1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he did not need to answer questions.  *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010) (citing *United States v. Panek*, 552 F.3d 462, 465 (6th Cir. 2009)).  The inquiry is necessarily specific to the facts of any given case; it is necessary to look at the totality of the circumstances to make the determination.  *Stansbury*, 511 U.S. at 322 ("In determining whether an individual was in custody, the court must examine all of the circumstances surrounding the interrogation . . . ."); *United States v. Swanso*n, 341 F.3d 524, 528 (6th Cir. 2003) ("In determining whether a defendant was subject to custodial interrogation we look to the totality of the circumstances . . . .").

In presenting this issue, for the most part, Petitioner simply recycles the arguments he raised in the Michigan appellate courts.  Petitioner invites this Court to review the suppression hearing testimony anew and reach its own conclusion regarding the totality of the circumstances.  To prevail, however, Petitioner must show how the findings of the trial court were unreasonable in light of the record.  *See* 28 U.S.C. § 2254(d)(2).  And noted above, under the AEDPA, the factual findings of the state court are entitled to the presumption of correctness, which petitioner must rebut by clear and convincing evidence.  *See Carter*, 110 F.3d at 1109.  Alternatively,

Petitioner must show that the trial court's determination regarding custody is contrary to, or an unreasonable application of, clearly established federal law.

Regarding the issue of custody, Petitioner addresses the trial court's decision under the proper AEDPA standard only in the conclusion of his brief.  (*See* Pet'r's Br., ECF No. 2, PageID.26-27.)  Petitioner claims that the trial court determined the custody issue contrary to clearly established federal law when it viewed the evidence from the officers' perspective rather than from the perspective of a reasonable person in the suspect's position.  Petitioner also claims the trial court's findings of fact are unreasonable with regard to Petitioner's freedom of movement at the home, with regard to whether Petitioner was given a choice to go to the station house, and with regard to whether the discussion of a ride home from the station would lead a suspect to believe he was not in custody.

### 1.    Officer's perspective

Petitioner claims the trial court's resolution of custody issue is contrary to clearly established law because the court considered the issue from the perspective of the police officers.  Petitioner's argument ignores the standard the court indicated it would apply in resolving the challenge:

> As it relates to the *Miranda* custody issue, I note the following law that's applicable.  *Miranda* warnings are constitutionally required and applied to the admissibility of statements made during custodial interrogations.  Custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way.
>
> Whether a suspect is in custody or deprived of his or her freedom of action in any significant manner requires a two-prong analysis.  First, the reviewing court must look at the circumstances surrounding the interrogation. Second, the reviewing court must determine whether,

11

given those circumstances, a reasonable person would have felt that he or she was at liberty to terminate the interrogation and leave.

\*    \*    \*

To determine whether a defendant was in custody at the time of the interrogation, courts must look to the totality of the circumstances with the key question being whether the accused reasonably could have believed that he was not free to leave.

The determination of custody depends on the objective circumstances of the interrogation rather than the subjective views harbored by either the interrogating officers or the person being questioned.  The inquiry centers on whether the defendant could have reasonably believed that he was not free to leave.

(Suppression Ruling Tr., ECF No. 8-6, PageID.407-409.)  The court's statement of the standard is consistent with clearly established federal law.

Petitioner accurately notes that, during the court's application of the standard, Judge Brickley referred to the perspective of the officers involved.  The court's reference to the officers' perspective, however, was clearly part and parcel of the court's assessment of the credibility of those officers:

I had the opportunity, however, to view the police officers on the stand as well as the defendant on the stand, and I'm convinced, after observing these officers and judging their credibility, that if any mistakes were made at any point in the investigation they were clearly made in good faith.

These officers were diligent in their duties and their desire to do them well.  They used their training and techniques in the process, which they are authorized and required to do.  They appeared to be very courteous to defendant and his family and, although defendant disagrees, they appeared to this Court to be making good faith efforts to respect defendant's rights along the way as well.  Each one of them on the stand appeared to this Court to be making a very honest effort to tell the truth about their involvement in this investigation and their memory of the events.

12

(*Id.*, PageID.410.)   The judge's focus on the good faith of the officers was not significant to her analysis of the "in custody" requirement; it was important, however, to her analysis of whether the officers had attempted an end-run around *Miranda* of the sort prohibited in *Siebert*.  That is apparent from the court's statements preceding the quote above:

> In making these determinations, the Court notes, first off, that I began when I reviewed the pleadings alone with some skepticism.  I do not know the officers involved in this case.  I've previously been involved in criminal defense work and I had some concern that, while this case was perhaps not as bold as the *Siebert* case, that it might have been kind of a *Siebert* light, a softer version, [a] runaround of *Miranda* that *Siebert* acknowledged as repugnant to *Miranda* and its values.

(*Id.*, PageID.409-410.)   The apparent good faith of the officers, therefore, stood in contrast to what the Judge Brickley, given her background in criminal defense, expected to find.

Additionally, the believable story the officers told stood in contrast to Petitioner's version.  The question of whether Petitioner was commanded to go with the officers to the police station—as Petitioner claimed—or invited to do so—as the officers claimed—was crucial to the court's analysis.  This was not a circumstance where all the witnesses described the same events and the court simply had to determine whether a reasonable suspect in Petitioner's shoes would conclude he or she was in custody.  The Petitioner's version of  "a command" could not be reconciled with the officers' version of "an invitation."  Based on the demeanor of the officers and Petitioner, the court found the officers' version to be credible and Petitioner's version of questionable credibility.  (*Id.*, PageID.410-411.)

13

Against the backdrop of that credibility determination, the trial court analyzed the facts:

> Considering all of that, I find the following as facts: Police arrived at his home, defendant's home, to investigate a criminal sexual conduct complaint tendered by a young child.  They were in receipt of some conflicting evidence about what, if anything, occurred, so this truly was an investigation scenario as opposed to let's just bolster our conclusions. One of the purposes of the questioning, therefore, was, as acknowledged by police on the stand, to investigate defendant as a suspect.

> The Court recognizes the number of police on scene and the fact that they wore uniforms, and these facts do bode in favor of a custody determination.

> When police arrived, however, people were allowed to move freely and, although some were interviewed and separated, one officer noted, "We weren't telling people where to stand or anything; it was their home."

> During this process, one officer asked another officer to ask defendant if he would voluntarily go to the station to be interviewed.  All of the officers were very clear on this point.  They did not have enough to arrest defendant, they had a young girl who had talked to someone else, her story conflicted with the SANE nurse['s] finding.

> Trooper Coles asked defendant whether he was willing to go speak to a detective sergeant at the station.  Defendant said, "Yes."  Police did not specifically tell defendant he did not have to go.  They also did not offer defendant the opportunity to drive his own car or have his family drive him, but there is no credible evidence on this record to suggest to this Court that there was a demand or that a reasonable person would believe he was not free to decline an invitation.  In fact, defendant at no point expressed any desire or interest in staying home nor did he make such a request in the police car en route or while at the station.

> Significantly to this Court, defendant was informed by officers that his parents would come get him at the conclusion of the interview.  His father, defendant's father, who this Court finds very believable as well, testified that he, too, was told he could pick defendant up.  This testimony would cause an objective person to believe that they are not, in fact, in custody.

14

Defendant was patted down prior to going in the police car for safety, which bodes in favor of a custody determination, but this was not a full search.  In addition, he was not handcuffed or restrained in any way, other than a seatbelt in the car either en route or in the interview room at the station.

Once there, he was left alone in the room with the door open, apparently free to get up and walk out if he chose to do so.  When the interview room door was shut, the detective noted that he was doing so for privacy reasons, so that others wouldn't hear them talking about the subject, a subject that is delicate and could be embarrassing and awkward.

Nothing in the tenor of any of the conversations with police, either at the home, en route or at the station indicate coercion or hostility in any way to this Court.  The police appeared polite and professional and courteous and, in many instances, very casual and conversational boding against a custody determination.

In fact, in the police car, the officers engaged in small talk entirely unrelated to the case and I think, as the trainee police officer testified, to sooth a tense situation.  The demeanor of the officers was corroborated by defendant's father.

The Court notes that the questioning did occur at a police station, but that fact alone does not require *Miranda*.

It lasted, when we take into account -- and I may not be precise on my estimation, but when we take into account some breaks, it appeared to be about an hour-and-a-half.

Once in the room, there was only one officer and he wore plain clothing.  Defendant was not told by the detective questioning him that he was specifically free to leave, and that could be a better practice.

The fact that other officers advised him that his parents were picking him up, however, coupled with the detective thanking him for coming in and clearly advising him that he was not under arrest would cause a person to reasonably believe he was free to leave.

These objective circumstance[s], when viewed in their totality, lead this Court to conclude that defendant was not in custody requiring *Miranda* prior to the time it was actually provided to him.

(*Id.*, PageID.411-414.)  Petitioner's suggestion that the trial court's analysis of the "in custody" requirement is contrary to clearly established federal law because it

15

considers the evidence from the officers' perspective rather than a reasonable suspect's perspective, therefore, finds no support in the record.

### 2.      Willing

Petitioner next challenges the court's "in custody" analysis by claiming the court's determination that "Trooper Coles asked defendant whether he was willing to go speak to a detective sergeant at the station" is not reasonable on the record. The key to Petitioner's argument is the word "willing." Trooper Coles testified that he asked Petitioner if Petitioner was willing to go to the post. (Mot. Hr'g Tr. I, ECF No. 8-4, PageID.187.) Trooper Coles testified extensively regarding the words he used:

| | |
|---|---|
| Trooper Coles: | Trooper Wileczek had contacted Detective Sergeant Criger over the phone and Detective Sergeant Criger was going to go to the post and assist with an interview if the defendant was willing to go in for an interview. The defendant – or excuse me. Trooper Wileczek asked if I could speak to the defendant about going to the interview. The defendant and I were getting along fine. We had no issues between us. So we felt at that time, since I had established a rapport with the defendant, I would probably be the most likely one to ask him that. |
| Prosecutor: | And you said if he was willing to go – |
| Trooper Coles: | Yes. |
| Prosecutor: | – to the post? So this was not mandated in any way? |
| Trooper Coles: | No, ma'am. |
| Prosecutor: | So how – what was the conversation you had with the defendant regarding going to the post? |
| Trooper Coles: | We spoke about him – whether he was willing to go to the post or not to speak to the detective sergeant. He was willing to go at that point. |

Prosecutor:           He said, "Yes?" You asked him if he was willing and he said, "Yes?"

Trooper Coles:        Yes.

                                *    *    *

Prosecutor:           So you said, "Are you willing to go with me to the post?"  He said "Yes."  And there was no discussion after that?

Trooper Coles:        Correct.

                                *    *    *

Defense Counsel:      And before you put him in the car, was he told that he didn't have to go with you?

Trooper Coles:        I don't remember that specific phrase coming out of my mouth.

Defense Counsel:      So the answer is no?

Trooper Coles:        No.

                                *    *    *

Defense Counsel:      Okay.  So are you telling this Court today that if – you sort of put the burden on Alec Johnson to tell you whether or not he wanted to go to the post. Correct?

Trooper Coles:        Ask that question once more, please.

Defense Counsel:      You put the burden on Alec Johnson telling you whether or not he wanted to go to the post.  Correct?

Trooper Coles:        Well –

Defense Counsel:      Is that what you're trying to lead us to believe?

Trooper Coles:        I asked him if he would go to the post and he agreed to go to the post.  That's how it was.

Defense Counsel:      Did you tell him he didn't have to?

Trooper Coles:        I didn't say those specific words, no.

                                17

| | |
|---|---|
| Defense Counsel: | Why not? |
| Trooper Coles: | Because he was agreeing to go. |

*   *   *

| | |
|---|---|
| Prosecutor: | [D]o you remember the specific words used when you asked the defendant if he was willing to go to the post for an interview? |
| Trooper Coles: | I do not recall the specific words. |
| Prosecutor: | Okay. Do you remember – what do you remember in terms of what you asked him? |
| Trooper Coles: | I asked him probably generally if he was willing to go to the post to tell us his side of the story, his side of the events. |
| Prosecutor: | Do you remember using the word "willing?" |
| Trooper Coles: | I can't say that I used that word. I don't know. |
| Prosecutor: | Okay.  And he just said, "Yes" and you proceeded? |
| Trooper Coles: | Correct. |

*   *   *

| | |
|---|---|
| Defense Counsel: | And you don't remember what you said specifically; you're just telling this Court generally,  "This is what I usually say."  Correct? |
| Trooper Coles: | Yes, sir. |
| Defense Counsel: | All right.  Did you tell – do you remember any of this conversation, where you told the defendant that he had to go to the post because they needed to record his statement because there was no recording device on-site? |
| Trooper Coles: | I don't know if that was said or not.  I do remember talking about the interview being recorded, yes. |
| Defense Counsel: | You do remember telling him that the interview will be recorded? |

18

Trooper Coles:      I believe so.

Prosecutor:         Did you tell him that's why he had to go to Paw so
                    that it could be recorded?

Trooper Coles:      I don't know if I told him that that's why he had to
                    go to Paw, but I do remember having a conversation
                    about video equipment at the post.

                              *    *    *

Prosecutor:         I just want to clarify.  Did you ever say he had to go
                    to the post?

Trooper Coles:      No.

                              *    *    *

Court:              And you're indicating it would have been basically
                    one sentence to him, something to the effect

Trooper Coles:      Correct.

Court:              – of "Are you willing to go

Trooper Coles:      Correct.

Court:              "– with me for an interview?"

Trooper Coles:      Correct.

                              *    *    *

Prosecutor:         [G]oing through your report, did you recall any
                    additional conversation that happened between
                    either yourself and Trooper Martin or yourself and
                    the defendant regarding the ride to the station?

Trooper Coles:      I don't recall anything additionally besides what I
                    testified to.

Prosecutor:         So just the fact that you asked if he was willing to go
                    to the station and he replied he was?

Trooper Coles:      Correct.

                              *    *    *

19

Defense Counsel:     But can you understand how a person in my client's position would see that as being in custody?

Trooper Coles:       Well, I asked him if he was willing to go, which he was willing to go.

Defense Counsel:     I understand that.

*   *   *

Prosecutor?          He just got in on his own?

Trooper Coles:       Yes.

Prosecutor:          After you had asked him if he would be willing to go to the post for an interview?

Trooper Coles:       Correct.

*   *   *

Court:               Okay. And then just to remind me from last week, you worded it that, "Would you be willing to come with me to the police station?"

Trooper Coles:       Something similar to that, yes.

Court:               Okay. Did you ever demand that he come to the station?

Trooper Coles:       No.

Court:               Okay. Did you ever tell him he had to go with you to the station?

Trooper Coles:       No.

Court:               Did he express any reservation at all about going with you?

Trooper Coles:       No.

*   *   *

Defense Counsel:     Trooper Coles, when Judge Brickley was asking you questions, she said – you testified that you said something similar to "Would you go with me to the

20

|                 |                                                                                                                                  |
|-----------------|----------------------------------------------------------------------------------------------------------------------------------|
|                 | police station?"  Do you not remember exactly what you asked?                                                                     |
| Trooper Coles:  | I don't remember each specific word that was used, but something similar to that phrase, yes.                                     |
| Defense Counsel:| So are you 100 percent sure that you did not say, "You have to come with us?"                                                      |
| Trooper Coles:  | Oh, I'm certain of that.                                                                                                          |
| Defense Counsel:| But you're not certain exactly what you said?                                                                                     |
| Trooper Coles:  | Yes, that's correct.                                                                                                             |

*     *     *

|                 |                                                                                                                                  |
|-----------------|----------------------------------------------------------------------------------------------------------------------------------|
| Prosecutor:     | We've heard testimony that you did not actually use a question asking permission for if the defendant would voluntarily go back to the station with you for the interview with Detective Sergeant Criger and that actually you told him he had to go with you, that he didn't have a choice.  Could you have said that? |
| Trooper Coles:  | No.                                                                                                                              |
| Prosecutor:     | No way, no how, you could not have said that?                                                                                    |
| Trooper Coles:  | No.                                                                                                                              |
| Prosecutor:     | Why?                                                                                                                            |
| Trooper Coles:  | Well, at that point, he certainly did have a choice. We hadn't -- I didn't have any evidence that would compel me to place him into custody or under arrest to take him back to the post for any interviews. |
| Prosecutor:     | So under the circumstances that you had, there would have been no way you said, "You have to go to the station with me for this interview?" |
| Trooper Coles:  | Correct.                                                                                                                         |

*     *     *

21

| | |
|---|---|
| Defense Counsel: | And you also testified that you don't know exactly what words you used when you talked to Mr. Johnson about leaving and going to the police post? |
| Trooper Coles: | Well, I think I've conveyed what the general phrase was. |
| Defense Counsel: | But you don't remember the exact wording. Right? |
| Trooper Coles: | I don't remember each specific word. |

(Mot. Hr'g Tr. I, ECF No. 8-4, PageID.186-188, 195, 198-204; Mot. Hr'g Tr. II, ECF No. 8-5, PageID.235-236, 243, 247, 249, 252, 359-360, 363.)

The record is replete with testimony supporting the court's determination that Trooper Coles asked Petitioner if he was willing to go to the post for an interview. Whether or not Trooper Coles actually used the word "willing" is immaterial to the reasonableness of the trial court's factual determination. Petitioner's argument, however, depends entirely on that immaterial point – that Trooper Coles did not use the word "willing." Petitioner has, therefore, failed to demonstrate that the trial court's factual determination is unreasonable on this record.

### 3.    Freedom of movement and the ride home

Petitioner's last two contentions regarding the factual determinations on the "in custody" issue do not claim that the court's determinations are unsupported by the record. There is testimony in the record to support the court's conclusion that "people were allowed to move freely and, although some were interviewed and separated, one officer noted, 'We weren't telling people where to stand or anything; it was their home.'" (Suppression Ruling Tr., ECF No. 8-6, PageID.411.) Certainly, Petitioner testified otherwise, but the officers' testimony, and even the testimony of

22

Petitioner's father, provides sufficient support for the court's finding. Similarly, there is support in the record, despite Petitioner's contrary testimony, regarding the ride home. Petitioner's challenge here, is not truly directed at the factual findings of the trial court. He attacks the court's conclusion that a reasonable suspect would not believe that he was in custody. But, Petitioner does not show how the trial court's conclusion is contrary to, or an unreasonable application of, *Miranda*. Instead, he invites the court to consider the evidence anew and reach a different conclusion. That is not permitted on habeas review.

### B. *Missouri v. Siebert*

In *Missouri v. Siebert*, 542 U.S. 600 (2004), a plurality of the Supreme Court held that the intentional interrogation of an arrestee without benefit of *Miranda* warnings, followed immediately by *Miranda* warnings and new questioning to obtain repetition of the prior statements, required exclusion under *Miranda* and *Oregon v. Elstad*, 470 U.S. 298 (1985). The premise of the *Siebert* decision, however, is that the initial interrogation is custodial.

To the extent Petitioner had succeeded on his first habeas ground—that his initial interview was custodial and conducted without *Miranda* warnings—then *Siebert* may have required suppression of the confession elicited after Detective Criger gave Petitioner the *Miranda* warnings. Without the foundation of an "unwarned" custodial interrogation, however, *Siebert* has no application. The trial court determined as much and that determination is entirely consistent with clearly established federal law. Petitioner is not entitled to habeas relief on his *Siebert* challenge.

### C.    Involuntary confession

Finally, Petitioner contends that his confession was involuntary in that it was coerced.   When a criminal defendant claims that his confession was rendered involuntary by police coercion, the court must inquire whether, considering the totality of the circumstances, the conduct of law enforcement officials overbore the will of the accused.   *See Mincey v. Arizona*, 437 U.S. 385 (1978); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973).   A suspect's state of mind, standing alone, cannot render a statement involuntary.   Rather, coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession.   *See Colorado v. Connelly*, 479 U.S. 157, 163-67 (1986).   Typically, findings of coercive police conduct involve brutality or threats of physical coercion.   *See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 287-88 (1991) (threats of physical violence); *Greenwald v. Wisconsin*, 390 U.S. 519 (1968) (defendant interrogated for eighteen hours without food or sleep while on medication); *Beecher v. Alabama*, 389 U.S. 35 (1967) (gun held to head of wounded suspect to extract confession); *Cooper v. Scroggy*, 845 F.2d 1385 (6th Cir. 1988) (officer struck defendant, failed to take steps to change coercive environment, and other detective threatened defendant).   Nevertheless, a confession may be rendered involuntary if it is the product of psychological pressure or coercion sufficient to overbear the will of the accused.   *See Fulminante*, 499 U.S. at 287-88. Among the circumstances to be reviewed by the habeas court are "the crucial element of police coercion, the length of the interrogation, its location, its continuity, the

24

defendant's maturity, education, physical condition and mental health." *Withrow v.*

*Williams*, 507 U.S. 680, 693-94 (1993) (citations omitted).

The trial court analyzed this issue as follows:

After considering the totality of the circumstances, the Court finds that the defendant's confession was voluntary. He was not in any physical or mental state that would impair his judgment. He was not injured, intoxicated, drugged, ill, deprived of food, sleep or medical attention, nor was he physically abused or threatened with abuse. In fact, he was not threatened or coerced in any way.

He did indicate that he'd been unable to take his medication that morning, only one of which may have some bearing on this proceeding, but I don't – from what I heard, it was not significant enough to deny him the appropriate mental state for a voluntary confession.

He did appear sad and distressed, which is appropriate for the circumstances.

There were no pressures that sapped his power of resistance of self-control.

He was aware of the accusations against him before agreeing to speak with police.

He was 25 years old at the time of the interview and presumably educated, as he had attended college and works as a social worker.

While he had limited experience with police, he'd at least experienced a prior accusation involving a child protective service investigation.

The questioning was not repeated or prolonged, and his confession occurred approximately 50 minutes into this hour-and-a-half interview.

He was not detained, as I've already determined, when he gave his statement.

He was not told of any constitutional rights, but was also not told – or he was also told that he was not under arrest.

The entire tone of the confession and conversation was conversational.

So it is clear to this Court that his confession was voluntary.

(Suppression Ruling Tr., ECF No. 8-6, PageID.418-419.)

Petitioner indicates his disagreement with the court's conclusion and invites this Court to reweigh the facts and reach a different conclusion.  But, Petitioner does not show that the trial court's factual determinations are unreasonable on the record. Indeed, the findings appear well-supported by the testimony at the suppression hearing.    Moreover, Petitioner has not shown that the trial court's conclusion regarding the voluntariness of Petitioner's confession is contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, Petitioner is not entitled to relief on this habeas ground.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.    A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.*  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.    Consequently, I have examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional

26

claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

Although reasonable jurists might debate whether Petitioner's interrogation was custodial or even whether his confession was voluntary, they would not debate whether the trial court's determinations of those issues were reasonable. Thus, I find that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims would be debatable or wrong. Accordingly, I recommend that the Court deny Petitioner a certificate of appealability.

Moreover, although I conclude that Petitioner has failed to demonstrate that he is in custody in violation of the constitution and has failed to make a substantial showing of a denial of a constitutional right, I would not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied.  I further recommend that a certificate of appealability be denied.  Finally, I recommend that the Court not certify that an appeal would not be taken in good faith.


Dated:  November 18, 2019                    /s/ Phillip J. Green
                                             PHILLIP J. GREEN
                                             United States Magistrate Judge

## NOTICE TO PARTIES

ANY OBJECTIONS to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).